NOTICE

Decision filed 11/16/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170271-U

NO. 5-17-0271

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-57 |
| | ) | |
| TIYE ALLEN, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Overstreet concurred in the judgment.

**ORDER**

¶ 1  *Held*: The defendant's conviction for first-degree murder is affirmed where the State did not commit prosecutorial misconduct in regard to the admission of a condensed version of the surveillance footage of the shooting, where the defendant did not receive ineffective assistance of counsel, and where, although the trial court committed error when it failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), this error did not amount to plain error because the evidence was not closely balanced. However, because the trial court failed to properly admonish the defendant pursuant to Illinois Supreme Court Rule 605(a) (eff. Oct. 1, 2001) after sentencing, we remand with directions that the court properly admonish him and allow him an opportunity to file an appropriate postsentencing motion.

¶ 2  This is a direct appeal from the circuit court of St. Clair County. At the April 2017 jury trial, the defendant, Tiye Allen, was convicted of first-degree murder. The trial court

1

then sentenced him to 60 years' imprisonment to be followed by 3 years of mandatory supervised release (MSR). On appeal, the defendant argues that he was entitled to a new trial because the State misrepresented the nature of an edited surveillance video of the incident and elicited false testimony regarding the contents of that video; the court failed to ensure that the potential jurors understood and accepted the four fundamental legal principles set out in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); the court erred at sentencing when it failed to consider, as evidence in mitigation, that imprisonment would be a hardship on the defendant's dependents; and he was not properly admonished in accordance with Illinois Supreme Court Rule 605(a) (eff. Oct. 1, 2001) after sentencing, so the case should be remanded to provide him with an opportunity to file a motion to reconsider his sentence. For the reasons that follow, we affirm the defendant's conviction and remand with directions.

¶ 3                                  I. BACKGROUND

¶ 4      On December 12, 2015, at approximately 1:15 a.m., the victim, Salahudin Malik Robbins, entered the Bottoms Up strip club (Bottoms Up) in Brooklyn, Illinois. Thereafter, at approximately 1:30 a.m., three men arrived at Bottoms Up in a black Audi; the three men were later identified as the defendant, Ryan Bryant, and Tony Lee Hampton. The black Audi parked between an SUV and a white Dodge Charger. At around 2:30 a.m., the three men exited Bottoms Up and got into the Audi. From Bottom Up's video surveillance, it appeared that Bryant got in the front passenger seat, the defendant got in the driver's seat, and Hampton got in the back seat. They remained inside the vehicle for about 25 minutes.

2

¶ 5 Around 3 a.m., Robbins exited Bottoms Up with three women and walked toward the parking lot. The surveillance video showed the driver's side door of the Audi opening and several shots being fired. That shooter remained by the vehicle. The video also showed another shooter get out of the back seat of the Audi, run around the SUV parked next to the Audi, and fire a few shots. That shooter then approached Robbins and shot him multiple times at close range while Robbins was lying on the ground. The driver then got back into the Audi and started to drive away. The other shooter ran back to the Audi and got into the back seat. The Audi then sped away.

¶ 6 A Village of Brooklyn police officer, who was patrolling in the area, heard the gun shots and went to Bottoms Up to investigate. He saw the black Audi leaving the parking lot and attempted to stop the vehicle. The driver did not stop, so the officer chased the vehicle into St. Louis, and he eventually lost sight of it.

¶ 7 The following day, the Illinois State Police (ISP) received an anonymous tip, suggesting that they compare a photograph of Hampton to the surveillance video. The ISP did so and concluded that Hampton was one of the suspects on the video and that he was from the St. Louis area. The ISP contacted the St. Louis City police department and was given names of people who had been arrested or in contact with them at the same time as Hampton. This led to the ISP identifying the defendant and Hampton as the two shooters and Bryant as the third person with them at Bottoms Up.

¶ 8 On January 15, 2016, the defendant was charged by indictment with one count of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) of Robbins and three counts of aggravated battery with a firearm (*id*. § 12-3.05(e)(1)) for the three bystanders who were

3

injured as a result of the shooting. On April 17, 2017, the State filed an amended notice of intent to seek a mandatory enhanced sentence based on three firearm enhancements pursuant to sections 5-8-1(a)(1)(d)(i), (a)(1)(d)(ii), and (a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(i)-(iii) (West 2016)).

¶ 9    On April 24, 2017, the first day of trial, the State requested the dismissal of two of the aggravated battery charges. The trial court granted the State's request and dismissed those charges. The State proceeded to trial on one count of aggravated battery with a firearm and one count of first-degree murder. At trial, the following testimony was presented.

¶ 10    Sherrod Stancil, who was previously employed as a patrol officer for the Village of Brooklyn, testified that at approximately 3 a.m. on December 12, while he was on routine patrol, he heard gunshots coming from the north end of town. He was approximately one block away from that area and immediately headed in that direction. When he arrived, he observed a black Audi leaving the Bottoms Up parking lot at a high rate of speed. He pursued the vehicle with his lights and siren activated, but the vehicle never stopped. The car's Missouri license plates were registered to a dark-colored Audi, but he could not tell who was in the vehicle or how many people were there. He followed the vehicle into Missouri, but he eventually lost sight of it and terminated pursuit. After that, he returned to the Bottoms Up parking lot. While there, he learned that Robbins was pronounced dead. He believed that there were other individuals that were injured in the shooting, but he did not have any contact with them because he was securing the scene. He contacted ISP to assist with the investigation.

4

¶ 11    Alexander Arosemena, who installed and maintained the video surveillance system at Bottoms Up, testified that he assisted Special Agent Randall Copsey, an ISP technology specialist, during this investigation. He explained that there were a total of 32 cameras, both outside and inside the club. The outside cameras were motion activated; the cameras continuously recorded but did not grab the recording until motion was detected. When motion was detected, it would go back 30 seconds and record from that point forward. He showed Special Agent Copsey how to download the digital images from the surveillance cameras and was present while Special Agent Copsey viewed the video of the actual shooting of Robbins. Arosemena identified one of the suspects as Hampton.

¶ 12    Special Agent Copsey testified that he extracted the video from the surveillance system. He transferred the data to a thumb drive and then put the recovered data on a DVD. This DVD was identified as the People's Exhibit 1A. He testified that the video clips on Exhibit 1A fairly and accurately depicted the data extraction from the surveillance system.

¶ 13    Special Agent Dennis Janis, an investigator in the ISP violent crime unit, testified that he was the case agent in this investigation. As part of his investigation, he watched the surveillance video of the incident. The video had clear images of the two shooters and showed the actual shootings. He testified that one of the shooters had a prominent neck tattoo on the front of his neck, and the shooter was later identified as Hampton. The second shooter was identified as the defendant, and the third person with them was Bryant.

¶ 14    Special Agent Janis received all of the video clips that were collected from the surveillance system. He then reviewed the clips and identified those that were relevant to the incident. He compiled those clips onto one DVD, which was identified as the People's

5

Exhibit 1B. He explained that there were five cameras total (inside and outside the club) that were helpful to the investigation, and two of the outside cameras captured the actual shooting.

¶ 15    Although the full video of the downloaded images was edited as a compilation of the important parts of what transpired that morning, he testified that it fairly and accurately depicted what he observed on the Bottoms Up system. Also, he noted that a particular clip had been edited to play in a faster speed than normal because the three men were sitting inside the black Audi for approximately 25 minutes; Special Agent Janis believed that they were waiting for Robbins to leave the club. At this point, the defendant's counsel objected to the admission of the edited video into evidence. Counsel stated that she did not object to showing the edited video to the jury as demonstrative evidence for efficiency purposes, but she did not think it was appropriate to admit the exhibit into evidence because it was an edited version of all of the videos. In response, the State noted that Special Agent Janis had testified that, although the video was edited, it was still a fair and accurate depiction of everything that happened. The State also argued that it was edited merely for ease of the jury viewing it. The court allowed the edited video to be played for the jury and reserved its ruling on the objection for a later time.

¶ 16    Special Agent Janis then continued his testimony about what the surveillance videos showed; the State played the condensed version of the footage for the jury while Special Agent Janis narrated. The video showed Robbins entering the club at approximately 1:15 a.m. on December 12. Shortly thereafter, the black Audi arrived with the suspects in it. Special Agent Janis believed that the defendant was driving, Hampton was sitting in the

6

front passenger seat, and Bryant was sitting in the back seat. The three men then entered the club. At around 2:30 a.m., the three men left the club and got into the black Audi. Special Agent Janis believed that the defendant got into the driver's seat, Bryant got into the front passenger seat, and Hampton was in the back seat. There was a white Dodge Charger parked beside the Audi, and it appeared that Hampton was talking to the people inside the Charger. Special Agent Janis testified that there was a point in the video where it appeared to him that somebody either got out of the Charger and into the vehicle with them or someone got out of the Audi while the other occupants waited inside the vehicle. After talking to Bryant, he learned that a fourth person did not get into the vehicle with them. All three men were in the Audi when Robbins exited the club around 3 a.m. Robbins was walking toward the club's parking lot with three female friends. The video showed Robbins and his friends walking in the parking lot when the driver's side door of the Audi opened, and a man, who Special Agent Janis identified as the defendant, got out and fired several shots in Robbins's direction. Hampton also exited the vehicle, ran around the SUV parked next to the Audi, and started shooting in Robbins's direction. He then ran up to Robbins and shot him at close range while Robbins was lying on the ground. The defendant got back into the driver's seat of the Audi and started driving away. Hampton ran to the vehicle and got in the backseat.

¶ 17 The following week, St. Louis City recovered a vehicle burned beyond recognition in an area near Washington Street. The vehicle appeared to match the description of the Audi, and, on the recovery report, the VIN number was the same as the black Audi. The vehicle did not have a license plate on it, but the officer who observed the Audi leaving the

7

parking lot that morning had reported a Missouri license plate of KL4SOU. However, that license plate was registered to Chris Masarek, who had an address in South County in St. Louis. They eventually learned that Masarek had a gray Audi with a rear license plate that matched the plate on the destroyed vehicle but with a front plate that did not match his vehicle; it was believed that someone had replaced his front license plate with a different plate that was registered to a Honda. Special Agent Janis spoke with both owners of the plates about their involvement in the shootings, and he did not believe that either one was involved.

¶ 18    On cross-examination, Special Agent Janis acknowledged that, at the time of the grand jury proceeding, he believed that a fourth person had gotten into the Audi that morning. He explained that, because of how the motion capture camera worked, he did not see anyone get out of the Audi, but he did see someone get in. He did not have an opportunity to interview Bryant before his grand jury testimony. He acknowledged that there could have been another exchange of persons in the Audi that morning that did not trigger the cameras.

¶ 19    Special Agent Elbert Jennings with the ISP testified that he was dispatched to Bottoms Up on December 12 for the homicide investigation. During his involvement with the investigation, he interviewed two of the witnesses on the scene and watched some of the video surveillance. On December 13, he received an anonymous call with a tip to check www.stlmugshots.com to compare the mugshot of Hampton listed on that website with the images of the suspects in the video. When he went to the website, he noticed that the mugshot of Hampton matched the image of one of the suspects.

8

¶ 20   Dr. Gershom Norfleet, the assistant medical examiner at the St. Louis County Medical Examiner's office, testified that he conducted Robbins's autopsy.  Initially, he observed 12 gunshot wounds to the body.  Robbins sustained gunshot wounds in the head, chest, left buttock, left thigh, right thigh, and right foot.  Dr. Norfleet recovered four separate fragments of ballistic material from Robbins's body.  He opined that the cause and manner of Robbins's death were the gunshot wounds to the head and chest.  The other injuries that Robbins sustained were not fatal.

¶ 21   James Randolph, who was previously employed as a crime scene investigator with the ISP, testified that he assisted with this investigation by processing the crime scene, photographing the scene, and collecting the evidence that was there.  While processing the crime scene, he discovered several fired shell casings on the ground in the parking lot.  He found 12 0.40-caliber shell casings from the area between the parked Audi and the SUV and six 9-millimeter shell casings that were recovered from the area behind and between the vehicles.  There was also a projectile and another 9-millimeter shell casing recovered closer to Robbins's body.

¶ 22   Bryant testified that he went with the defendant and Hampton to Bottoms Up on December 12 to get drinks.  They rode with the defendant in his black Audi and got to the club at around 2 a.m.  They stayed at the club for about 30 to 45 minutes.  He saw Robbins in the club, but none of them interacted with Robbins.  Thinking that all three were leaving the club, he exited with Hampton.  However, he noticed that the defendant was not with them, so he went back inside to get the defendant.  After exiting, they went to the Audi, got inside, and sat there in the parking lot.  The defendant was sitting in the driver's seat,

Bryant was sitting in the front passenger seat, and Hampton was in the back seat. They did not leave the parking lot because Hampton was talking to the two occupants of the white Charger parked next to them about what they were doing later; Hampton had his window rolled down and was talking to them through the window. Hampton wanted the driver of the Charger to drop Bryant off, and, at one point, Bryant got into the Charger. However, he did not know who the occupants of the vehicle were, so he decided to get back into the Audi. He got into the front passenger seat of the Audi. No one else got into or exited the Audi that morning.

¶ 23    Bryant testified that Hampton and the defendant had discussed how Robbins was staring at them but that was all they said about Robbins. When Bryant got back into the Audi, he noticed that both Hampton and the defendant had guns on them; Hampton had a short gun that looked like a semi-automatic on his lap while the defendant had a longer gun that appeared to be a semi-automatic on the side of his leg. He had not seen the guns before then, and he did not ask about the guns. He did not see Robbins exit the club because he was nodding off. He heard the defendant say, "there he go" and then a gunshot. He observed the defendant firing his gun in Robbins's direction and then Robbins fall to the ground. He also saw some girls that were near Robbins run away. While the defendant was shooting, Hampton got out of the Audi, went behind the SUV that was to the right of the Audi, and started shooting in Robbins's direction. Hampton then ran closer to Robbins as he continued to shoot. The defendant then got back inside the vehicle. As the defendant started to drive away, Hampton ran back to the car and got inside. Both men had their guns

10

with them when they got back inside the car. Bryant testified that he had previously viewed Exhibit 1B, and it fairly and accurately depicted what happened that morning.

¶ 24    As they were pulling out of the parking lot, they encountered a police car with lights and siren activated. The defendant did not pull over, and the officer followed them into St. Louis until the officer finally lost sight of them. They went to an apartment complex in downtown St. Louis and switched vehicles; the defendant had the key to the new vehicle. Hampton then called the occupants of the white Charger, and they all met up at a gas station. Then, they went back to the Audi and moved it to a vacant lot. The defendant directed them to wipe down the Audi and set it on fire. After wiping down the Audi, Hampton poured gasoline all over it, and one of the other guys set it on fire. After setting the Audi on fire, Bryant was dropped off at home. Before exiting the vehicle, both the defendant and Hampton told him to keep his mouth shut. They never said why they shot Robbins, but Hampton did say that he "got him." There was no discussion before going to the club about knowing that Robbins would be there, there was no conflict with Robbins inside the club, and the only mention of Robbins was that he had been staring. Hampton's discussion with the people in the Charger was only about who they were going to meet up with later. Bryant admitted that he had been drinking in the club, and he did not remember whether he had used any drugs.

¶ 25    Thomas Gamboe Jr. testified that he was a forensic scientist specializing in the areas of firearm, tool mark, footwear and tire track identifications by the ISP. He was assigned to the Metro East laboratory in Belleville and received evidence obtained from the crime scene to test. He received 12 0.40-caliber Smith & Wesson discharged cases and seven 9-

11

millimeter Luger caliber discharged cartridge cases. After comparing the 0.40-caliber discharged cartridge cases, he determined that all 12 were fired from the same firearm. He explained that usually 0.40-caliber pistols were longer pistols that range from about six to nine inches long. He also determined that all seven of the 9-millimeter caliber cartridge cases were fired from the same firearm. He explained that this firearm was likely a smaller pistol. The 0.40-caliber casings and the 9-millimeter caliber casings could not have been fired from the same gun due to the size difference. Most of the bullets recovered from the body were 9-millimeter. There were two recovered from the body that were 0.40-caliber. The injuries to Robbins's right knee were from 0.40-caliber projectiles. No firearms were recovered for testing.

¶ 26    Over defense counsel's objection, the trial court allowed the introduction of Exhibit 1A and 1B into evidence. After the State finished presenting its evidence, it then moved for dismissal of the remaining aggravated battery charge and rested its case. The defense presented no evidence and also rested. After hearing closing arguments and receiving the relevant jury instructions, the jury found the defendant guilty of first-degree murder. The jury also found that all three of the firearm enhancements were applicable given that the defendant had personally discharged a firearm that was the proximate cause of Robbins's death. The jury members were subsequently polled, and each juror confirmed that this was their verdict. The court then entered judgment on the verdicts.

¶ 27    On May 24, 2017, the defendant filed a motion for judgment notwithstanding the verdict or a new trial. In the motion, the defendant contended that the State failed to prove him guilty beyond a reasonable doubt, that the trial court erred in denying his motion *in*

12

*limine* relating to the admission of testimony regarding the only aggravated battery count that went to trial, that the court erred in denying his motion *in limine* related to the admission of testimony of Robbins's wife to establish his identity, and that the court erred in denying his motion of judgement of acquittal at the close of the State's case and at the close of all of the evidence.

¶ 28   On June 13, 2017, the trial court held the defendant's sentencing hearing. Initially, the court announced that it was denying the defendant's posttrial motion. It then proceeded to the sentencing hearing. The State noted that the sentencing range would be 45 years to natural life imprisonment with the sentence enhancement and requested that the defendant be sentenced to 65 years' imprisonment. The State contended that although the defendant likely did not fire the fatal shots, he fired his gun at least 12 times in Robbins's direction, that he was the first person shooting at Robbins, that he was the person who drove the vehicle and led a police officer on a high-speed chase, and that he directed everyone to wipe down the Audi and light it on fire. In aggravation, the State argued that the defendant's conduct caused and threatened serious harm in that he fired at least 12 shots in the direction of Robbins while Robbins was walking with three other people and while others were in the vicinity and then led a police officer on a high-speed chase. The State also argued that a stern sentence was necessary for deterrence to show that the court would not tolerate the senseless killing of another. The State contended that the defendant had no concern for the life of Robbins, anyone else in that parking lot, or anyone on the road.

¶ 29   In response, defense counsel requested a sentence at the lower end of the sentencing range. Counsel argued that the defendant was the son of a single mother and did not know

13

his father, that he did not complete high school, and that he was young (21 years old) and had not begun to explore the opportunities that life would present. Counsel also noted that, a few weeks before the trial, the mother of the defendant's three young children was murdered, and the children were now without a mother and a father. Counsel requested a lower sentence so that the children could at some point have their father in their lives. In his statement of allocution, the defendant asked the court to give him a lower sentence so that he could get back to his children.

¶ 30　After hearing the arguments and the defendant's statement in allocution, the trial court sentenced him to 60 years' imprisonment. In announcing this decision, the court found that there were not any statutory factors in mitigation. The court then stated as follows:

> "[There] are certainly human factors that go into why life circumstances put individuals into situations that cause them to engage in criminal conduct.
> 　　The thing about this crime is to call it criminal conduct doesn't really fully explain what happened. If I'm recalling the evidence, I think your codefendant shot—fired at least as many shots as you did. We all know from our experience or those of us that have worked in the criminal justice system for any period of time know that a person can die from one gunshot wound. And Malik Robbins suffered many more than one.
> 　　I don't know if it would make any difference to any of us if I knew why you and the other people involved in this did what you did.
> 　　***
> 　　*** But I would have to admit to some curiosity as to why it happened, but I don't know that it would make any difference. Because the fact is what you and your associates did—I think from the evidence and hearing the evidence, there's definitely a fair inference that it was preplanned. It was preconceived. You were part of that plan. We hear a lot now about conspiracies and people agreeing to do things and we hear that on a national level. We hear it all the time in many other places. But we saw that play out here in—on video in large part, although there was, I'm sure, planning involved leading up to that fact.
> 　　In mitigation [*sic*] obviously your conduct threatened the harm of many other people that were walking around on the streets that night.

14

You do have a history of criminal conduct, although it's not significant. I don't think that a life sentence would be appropriate. I think that would be excessive under the circumstances. But I do think a significant sentence in terms of years that may result in you not getting released is appropriate. Even the minimum sentence could result in you not out living your sentence. And that's a factor that I consider. The statutory gun factor adds 25 years to the sentence.

I think the appropriate sentence under the circumstances is a term of 60 years in the Illinois Department of Corrections. I sentence you to 35 years for the offense of first degree murder, and an additional 25 years will be added to that for the statutory gun enhancement. I order that you serve that sentence at 100 percent pursuant to truth-in-sentencing. And if you do out live that sentence, you will be ordered to serve three years of mandatory supervised release if you do survive that sentence."

¶ 31 After announcing the sentence, the trial court then admonished the defendant as follows regarding his rights to an appeal:

"You have 30 days from today's date to file a notice of appeal or to file in this court a motion to reduce or modify the sentence. You can file either one.

I will appoint an attorney to represent you on the appeal at the Appellate Court in Mount Vernon, Illinois."

The court then told the defendant that his counsel was going to file the notice of appeal and asked the defendant whether he understood his rights on appeal. The defendant responded, "You say I got 30 days to file it?" The court answered that the defendant's counsel was going to file the notice for him but technically his rights would last for 30 days. The court then asked whether the defendant understood his rights, and the defendant said, "Yeah."

¶ 32 The defendant did not file a motion to reconsider sentence, but he did file a notice of appeal on July 10, 2017.

¶ 33                                    II. ANALYSIS

¶ 34 On appeal, the defendant raises the following arguments: (1) that the State misrepresented the nature of the edited surveillance video and elicited false testimony

15

regarding the contents of that video, preventing the jury from fairly assessing whether he could be one of the shooters; (2) that trial counsel was ineffective because counsel failed to correct the State's misleading representation of what the edited video showed and failed to impeach Janis regarding the numerous substantial gaps in the video during which other people could have replaced the defendant in the driver's seat of the Audi; (3) that the trial court failed to ensure that the potential jurors understood and accepted the principles set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); (4) that the court erred at sentencing when it failed to consider, as evidence in mitigation, that imprisonment would be a hardship on the defendant's dependents; and (5) that he was not properly admonished in accordance with Illinois Supreme Court Rule 605(a) (eff. Oct. 1, 2001), so the case should be remanded to provide him with an opportunity to file a motion to reconsider his sentence.

¶ 35    The defendant first argues that the State mischaracterizes the nature of the edited surveillance video that was played for the jury (in particular, clip 14, which was the portion of the video where the suspects were sitting inside the Audi for approximately 25 minutes). At trial, the State noted that the surveillance tapes had been edited to show a compilation of the important parts of the events of that morning and that the clip showing the suspects waiting in the Audi was edited to play at a faster speed for ease in viewing. The State's argument during trial was that there were only three people in the Audi at that time and that no one entered or exited the Audi for those 25 minutes.

¶ 36    However, the defendant contends that the video actually demonstrates that there would have been multiple opportunities for the person in the driver's seat to change without

16

that exchange being captured by the surveillance system. The defendant argues that the State misled the trial court and the jury about that portion of the surveillance video because, not only was the video played at a faster speed, but there were 14 gaps in the clip that were spliced together to make clip 14. Specifically, the defendant noted that clip 14 was comprised of 16 different clips, that the total amount of time covered by those clips was actually 14 minutes and 47 seconds (not 25 minutes), and that there was a total of 5 minutes and 21 seconds of time that was not recorded.

¶ 37 The defendant argued that although Special Agent Janis specifically testified that there were no "sizable gaps" in the video footage, the gaps were of the following durations: 27 seconds, 53 seconds, 16 seconds, 13 seconds, 41 seconds, 7 seconds, 11 seconds, 15 seconds, 8 seconds, 47 seconds, 7 seconds, 48 seconds, 13 seconds, and 15 seconds. He contends that the gap between recordings during which Bryant exited the Audi and got into the Charger, which did not trigger the surveillance cameras, totaled 12 seconds. Thus, he contends that any gap of approximately 12 seconds or longer allowed adequate time for the drivers to change in the Audi. The defendant further argues that the State's misconduct was exacerbated when, during both opening statements and closing arguments, the State indicated that the video showed that no one exited or entered the Audi during the entire time that the suspects were waiting inside.

¶ 38 In making this argument, the defendant acknowledges that he forfeited this argument concerning the video because, although trial counsel objected to the admission of the edited video into evidence, counsel failed to object to any alleged prosecutorial

17

misconduct with regard to the edited video. However, he claims that it can be reviewed under either prong of plain-error review.

¶ 39    The plain-error doctrine bypasses forfeiture principles and allows a reviewing court to consider unpreserved error when: (1) the evidence is closely balanced, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. McDonald*, 2016 IL 118882, ¶ 48. The first step of plain-error review is determining whether any error occurred. *Id.*

¶ 40    Here, after carefully reviewing the record, which includes the full version of the video clips (Exhibit 1A) obtained from the Bottoms Up surveillance system as well as the edited version (Exhibit 1B) of the video, we find that there was no error. The testimony indicated that the surveillance cameras at Bottoms Up were motion activated and would not grab the recordings unless they were triggered by motion. Special Agent Janis explained that Exhibit 1A included footage obtained from several different cameras (both inside and outside of the club) that was compiled onto one DVD and that some of the footage did not show the victim or the suspects in it. The DVD contained over 100 clips and were organized by camera, so they were not presented in a way that would create a cohesive viewing experience; this made it difficult to find the relevant clips. After identifying the clips that were relevant to the incident and primarily included the suspects and/or the victim, Special Agent Janis merged those clips on one DVD, making Exhibit 1B; he testified that Exhibit 1B was a compilation of all of the important parts of the events of that morning on one DVD. Although Exhibit 1B did not contain all of the video footage, Special Agent Janis testified that it fairly and accurately depicted what he observed on the

18

Bottoms Up surveillance system. As for clip 14 on Exhibit 1B, the testimony revealed that, after leaving the club, the suspects waited in the parking lot for approximately 25 minutes, presumably waiting for the victim to exit the club. For ease of viewing, this clip was played at a faster speed, and it does not appear that the clip or the footage on Exhibit 1A contained the entire 25 minutes that the suspects were waiting in the Audi (likely because the cameras, which were motion triggered, were not grabbing the recordings the entire time).

¶ 41 Although Special Agent Janis stated that there not any "sizable gaps" in the footage, he testified that all of the clips, which included clip 14, fairly and accurately depicted what he observed on the Bottoms Up system. Special Agent Copsey testified that Exhibit 1A was all of the data that he extracted from the surveillance videos and that it fairly and accurately depicted the data from the surveillance. Also, the ISP officers' testimony was corroborated by Bryant, who testified that, except for him quickly leaving the vehicle one time, no one else got into the Audi that morning and no one else exited the vehicle during that time. Bryant further testified that the defendant remained in the driver's seat of the Audi from the time that they left the club until Robbins exited the club and the shooting began. Exhibit 1A, which contained the footage obtained from all of the surveillance cameras that morning, does not show the defendant exiting the vehicle or someone of a similar build to the defendant replacing him in the driver's seat of the Audi. This video was also introduced into evidence, although it was not played for the jury during trial. Thus, we conclude that the evidence did not indicate that Exhibit 1B, the condensed version of the surveillance videos, (or even Exhibit 1A) misrepresented what actually occurred that morning. Because the testimony revealed that the surveillance videos played for the jury

19

accurately portrayed what happened that morning, which was corroborated by Bryant, we find that the fact that the jury may not have been specifically informed that there were gaps in clip 14 did not constitute prosecutorial misconduct. Thus, we reject the defendant's argument that the State intentionally misled the jury and knowingly solicited perjured testimony about the nature of the recordings played at trial.

¶ 42    Moreover, Bryant testified that, at some point during that 25 minutes, he exited the Audi and got into the white Charger parked next to them. He did not remain there long and got back into the front passenger seat of the Audi. This entire exchange was not captured on the surveillance videos as they were not triggered until the car door of the white Charger opened and closed. This clip was played for the jury during Special Agent Janis's testimony, and he noted that the video did not show who exited the Audi. Defense counsel also elicited testimony from Special Agent Janis on cross-examination that there could have been another exchange of persons in the Audi that was not captured on the video. Thus, the jury was presented with evidence that it was possible that the defendant could have exited the Audi before the shooting happened without triggering the surveillance cameras. However, the jury still found the defendant guilty.

¶ 43    The defendant has also raised an alternative argument, that his counsel was ineffective for not objecting when "faced with the State's misleading representation of what clip 14 actually demonstrated." The defendant contends that his counsel's failure to correct the State and impeach Special Agent Janis regarding the numerous substantial gaps in the video during which someone else could have gotten in the driver's seat likely made a difference between his conviction and an acquittal.

20

¶ 44     To demonstrate that his counsel was ineffective, defendant has the burden to prove that counsel's performance was deficient, and that the deficient performance prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to establish either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35. To show deficient performance, defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness. *People v. Veach*, 2017 IL 120649, ¶ 30. With respect to deficient performance, defendant must overcome the "strong presumption" that counsel's action or inaction was the result of sound trial strategy, rather than incompetence. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). As such, trial-strategy matters are immune from ineffective-assistance claims, unless counsel's strategy was so unsound that counsel completely failed to conduct any meaningful adversarial testing of the State's case. *People v. West*, 187 Ill. 2d 418, 432-33 (1999).

¶ 45     Here, as noted above, Exhibit 1B was compiled from the footage on the Exhibit 1A DVD, Special Agent Copsey testified that Exhibit 1A accurately portrayed what he extracted from the surveillance videos, Special Agent Janis testified that clip 14 of Exhibit 1B accurately portrayed what he saw on the surveillance footage, and Bryant's testimony about what occurred that morning was consistent with the video clips played for the jury. Also, testimony was presented that the cameras were motion activated and would not capture the recordings unless triggered by motion. As previously noted, counsel elicited testimony that an exchange of drivers could have occurred without triggering the cameras. Further, we note that counsel did object to Exhibit 1B being introduced into evidence on

21

the grounds that the video was edited and did not contain all of the video from that morning. However, the trial court overruled this objection. Based on the above, we reiterate our previous conclusion that the evidence does not support the defendant's argument that the State intentionally misled the jury about the nature of the clips contained on Exhibit 1B. Accordingly, we cannot find that the defendant's trial counsel was ineffective for failing to raise a meritless prosecutorial misconduct argument.

¶ 46    The defendant's next argument is that the trial court erred by failing to properly inquire of the jury the four principles set out in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), commonly referred to as the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)). Although he failed to preserve the issue for appellate review, the defendant contends the alleged error is reversible under the first prong of the plain-error doctrine. The State concedes that the court failed to comply with Rule 431(b) because it did not specifically question all potential jurors as to whether they understood and accepted the four *Zehr* principles, but it contends that the error does not constitute plain error.

¶ 47    The Illinois Supreme Court adopted Rule 431(b) to ensure compliance with its decision in *Zehr*, 103 Ill. 2d 472. *People v. Glasper*, 234 Ill. 2d 173, 187 (2009). Rule 431(b) requires a trial court to ask potential jurors if they understand and accept the following principles: "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her[.]" Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Rule 431(b) is not

merely a suggestion; failure to strictly comply threatens the integrity of the jury's guilty verdict. *People v. Reed*, 376 Ill. App. 3d 121, 125 (2007); *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 25. Rule 431(b) mandates a specific question and response process to ensure the jurors' understanding and acceptance of the *Zehr* principles. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. *Id.* The rule requires that, although the questioning may be done individually or in a group, each prospective juror must have an opportunity for a response on their understanding and acceptance of these principles. *Id.* The trial court's failure to ask each juror if he or she understands and accepts each of the enumerated principles constitutes noncompliance with Rule 431(b). *Id.*

¶ 48    In the instant case, the trial court instructed the potential jurors that there were four principles of criminal law that were basic and applied to all criminal defendants in criminal cases in Illinois. The court then discussed the individual principles as follows. The court instructed the potential jurors as to the first principle (the presumption of innocence) and asked each group (the court grouped the potential jurors by row) to raise their hand if they did not understand that principle. There was only one potential juror that raised her hand. The court then addressed that potential juror by further explaining the presumption of innocence and then asked whether that clarified the principle. After the juror indicated that she understood, the court then asked each group to raise their hand if they could not apply that principle to the defendant. No hands were raised. The court then addressed the remaining principles in this same manner, and no one raised their hand for the remaining principles.

¶ 49    As noted above, the State concedes that the trial court erred by not specifically questioning all potential jurors as to whether they understood and accepted each of the *Zehr* principles. However, the State contends that this does not amount to plain error.

¶ 50    As already stated, the plain-error doctrine bypasses forfeiture principles and allows a reviewing court to consider unpreserved error when: (1) the evidence is closely balanced, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *McDonald*, 2016 IL 118882, ¶ 48. The defendant acknowledges that our supreme court has held that a Rule 431(b) violation is not cognizable under the second prong of the plain-error doctrine, absent evidence that the violation produced a biased jury. See *People v. Wilmington*, 2013 IL 112938, ¶ 33. The defendant does not argue that his jury was biased. Thus, the trial court's Rule 431(b) error is not reviewable under the second prong of the plain-error doctrine. The defendant contends that the error is reviewable under the first prong because the evidence was closely balanced and the error in failing to ensure the selection of an impartial jury tipped the scales in favor of the State.

¶ 51    Under the first prong, a reviewing court may consider an unpreserved error when it is clear or obvious and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant. *People v. Sebby*, 2017 IL 119445, ¶ 51. When determining whether the evidence is closely balanced, a reviewing court must evaluate the totality of the evidence. *Id.* ¶ 53. The reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense, along with any evidence regarding the witnesses' credibility. *Id.*

24

¶ 52    In this case, the State argues the evidence was not closely balanced. We agree. The surveillance videos showed the suspects leaving the club, getting into the Audi with the defendant in the driver's seat, Robbins leaving the club, and a person with a similar build of the defendant's getting out of the driver's side of the Audi and starting to shoot at Robbins. Bryant identified the defendant as the person sitting in the driver's seat. Bryant also testified that he observed the defendant sitting in the driver's seat with a long, semi-automatic firearm. Once Robbins exited the club, Bryant heard the defendant exclaim, "there he go," and saw the defendant firing his gun from the driver's side of the vehicle toward Robbins. Bryant then testified that the defendant fired his gun multiple times, and he saw Robbins hit the ground. The defendant drove the Audi from the scene of the shooting, did not stop when Stancil attempted to pull him over, and then directed the burning and cover-up of the Audi. Bryant's testimony was corroborated by the video surveillance from that morning and the testimony of the other officers that were involved in the investigation. In light of these circumstances, the trial court did not commit plain error because the evidence was not closely balanced. Because the court's Rule 431(b) error is not reviewable under either the first or second prong of the plain-error rule, the defendant cannot meet his burden of persuasion. Accordingly, reversal is not warranted on the sole basis that the court erred in admonishing the prospective jurors under Rule 431(b).

¶ 53    The defendant next contends that the trial court failed to comply with Illinois Supreme Court Rule 605(a)(3) (eff. Oct. 1, 2001) at his sentencing hearing when it gave him insufficient admonishments after sentencing him. Specifically, the defendant argues that the court failed to admonish him that, if he sought to challenge the correctness of his

25

sentence or any aspect of his sentencing hearing, he was required to file a motion to reconsider sentence before filing an appeal. He argues that he was prejudiced by the court's insufficient admonishments because his argument that the court failed to consider a relevant statutory factor in mitigation (*i.e.*, that the court failed to consider, as a factor in mitigation, that imprisonment would be a hardship on his dependents) was forfeited by his failure to file a motion to reconsider sentence. Thus, the argument can only be reviewed as plain error. The State concedes this case should be remanded with directions to admonish the defendant pursuant to Rule 605(a)(3) and allow him an opportunity to file a postsentencing motion.

¶ 54    Illinois Supreme Court Rule 605(a)(3) provides that in cases where a defendant is sentenced after a plea of not guilty, the trial court shall, at the time of sentencing, admonish defendant: (1) that the right to appeal the judgment of conviction, excluding the sentence imposed or modified, will be preserved only if he files a notice of appeal in the trial court within 30 days from the date on which the sentence is imposed; (2) if he seeks to challenge his sentence, or any aspect of the sentencing hearing, he must file a written motion to reconsider the sentence within 30 days of sentencing; (3) any claim of error regarding the sentence imposed, or any aspect of the sentence, shall be deemed waived if not raised in the written motion to reconsider the sentence; and (4) defendant must file a notice of appeal in the trial court within 30 days from the entry of the order disposing of the motion to reconsider sentence or order disposing of any challenges to the sentencing hearing, if he wishes to preserve his right to appeal. Ill. S. Ct. R. 605(a)(3) (eff. Oct. 1, 2001). However, not every case of improper admonishment requires remand.

26

Where a trial court fails to properly admonish a defendant in accordance with Rule 605(a), remand is only required if he is prejudiced or denied real justice as a result of the inadequate admonishments. *People v. Henderson*, 217 Ill. 2d 449, 466 (2005).

¶ 55 Here, following sentencing, the trial court instructed defense counsel to file a notice of appeal on the defendant's behalf. The court then admonished the defendant as follows: "You have 30 days from today's date to file a notice of appeal or to file in this court a motion to reduce or modify the sentence. You can file either one. I will appoint an attorney to represent you on the appeal at the Appellate Court in Mount Vernon, Illinois." The court then told the defendant that his defense counsel would file a notice of appeal for him. The defendant was not instructed that he must file a motion to reconsider his sentence if he wished to challenge any aspect of his sentencing hearing. He also was not instructed that any issue not raised in a postsentencing motion would be waived for appellate review. Thus, the court did not comply with Rule 605(a)(3).

¶ 56 Although the defendant has raised a sentencing issue on appeal despite his improper admonishments, the State concedes that he was prejudiced by the court's incomplete admonishments because the sentencing issue was forfeited and was thus subject to plain-error review. In cases where a defendant raises sentencing issues on appeal that have not been properly preserved as a result of inadequate Rule 605(a) admonishments, the appellate court can either hear the challenge itself or remand to the trial court. *Henderson*, 217 Ill. 2d at 468. Accordingly, we remand to the trial court with directions that the court properly admonish defendant in compliance with Rule 605(a) and allow him an opportunity to file an appropriate postsentencing motion. Because we are remanding for complete Rule

27

605(a) admonishments, we find it unnecessary to address the defendant's plain-error argument concerning the court's failure to consider an appropriate factor in mitigation. On remand, the defendant would be allowed to seek reconsideration of his sentence and assert any challenge to the sentencing hearing in the trial court as contemplated by Rule 605(a), including the issue raised here on appeal.

¶ 57   In summary, we affirm the defendant's conviction for first-degree murder. We remand the cause to the trial court with directions that the court properly admonish the defendant in compliance with Rule 605(a) and allow him an opportunity to file an appropriate postsentencing motion.

¶ 58                           III. CONCLUSION

¶ 59   For the foregoing reasons, we affirm the defendant's conviction and remand with directions that the trial court properly admonish the defendant in compliance with Illinois Supreme Court Rule 605(a) (eff. Oct. 1, 2001).


¶ 60   Affirmed and remanded with directions.